# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01087-SCT

*THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER a/k/a UNIVERSITY HOSPITAL a/k/a UMC*

*v.*

*JOEY GORE*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/13/2008 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LANNY R. PACE |
| | JAMES SETH McCOY |
| ATTORNEYS FOR APPELLEE: | ROBERT FARLEY WILKINS |
| | JOHN P. FOX |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED – 08/05/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., LAMAR AND KITCHENS, JJ.**

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Joey Gore, who was the recipient of an unsuccessful kidney transplant at the University of Mississippi Medical Center (UMC), sued UMC, as well as several other entities, for medical negligence. The matter proceeded to trial against UMC and one other entity, LifeSource Upper Midwest Organ Procurement Organization, Inc. (LifeSource). The jury considered the liability of UMC and LifeSource and returned a defense verdict in favor of both. The jury verdict was advisory as to UMC, and the trial court chose not to follow it.

It found UMC liable and awarded Gore $326,678.13 in damages. UMC then timely appealed to this Court.

¶2.     On appeal, UMC raises four issues: 1) whether the trial court's findings of fact supporting its liability finding against UMC are against the overwhelming weight of the evidence; 2) whether the trial court abused its discretion in allowing Gore's expert to testify regarding kidney-transplant surgery and whether UMC medical staff was negligent; 3) whether UMC is immune from liability pursuant to the Mississippi Anatomical Gift Law (specifically, Mississippi Code Section 41-39-135); and 4) whether the trial court's findings supporting the damage award are against the overwhelming weight of the evidence.

¶3.     We conclude that the trial court's findings of fact supporting its liability finding against UMC are against the overwhelming weight of the evidence. Further, we find that this issue is dispositive and renders the other issues moot. Therefore, we reverse and render, finding UMC free of any liability.

## FACTS AND PROCEDURAL HISTORY

¶4.     This case arises out of an unsuccessful kidney-transplant procedure performed on Joey Gore by UMC surgeons in February 2002. It is undisputed that the transplant was unsuccessful because the renal artery connected to the donor kidney had an intimal tear (a tear of its inner lining) at the artery's midpoint, which prevented the flow of arterial blood into the kidney at the time UMC surgeons attached the renal artery to Gore's artery and attempted to reintroduce blood into the kidney.

2

¶5.    At trial, through unrebutted defense-witness testimony, UMC explained how kidneys customarily are procured and transplanted. This defense-witness testimony was provided largely by Dr. James Wynn, UMC's expert witness, who is board-certified in general surgery, completed a fellowship in transplantation surgery, has procured kidneys throughout his career, has transplanted approximately a thousand kidneys over the years, has regularly performed vascular surgery (i.e., surgery related to arteries or veins) outside the realm of transplant surgery, holds several leadership positions related to transplants, and has performed research and published papers about kidney transplants. Dr. William Henry Barber, the UMC surgeon who performed Gore's unsuccessful transplant surgery, also provided testimony regarding customary kidney procurement and transplant procedures. Dr. Barber is board-certified in general surgery, has a specialty in transplantation surgery, began performing kidney transplants in 1986, has performed approximately eight-to-nine hundred kidney transplants over the years, belongs to professional associations related to transplants, and has performed research and authored approximately fifty articles in the field of transplantation.

¶6.    Dr. Wynn testified that, in cases like the instant one, the transplant process begins with the procurement of organs from a donor who is brain-dead. To procure the organs from the body of the donor, surgeons make a long incision from the breast bone to the pubic bone to expose all the organs. The surgeons then take steps to preserve the organs in preparation for the eighteen-to-twenty-four-hour period that the organs will be outside a body. These steps include flushing or perfusing the organs (while still in the donor's body) with a

3

preservation solution that replaces all of the blood that the organs previously contained. Thus, even before the procuring surgeons handle the kidneys, or even see the kidneys and renal arteries (which are located behind other organs), the kidneys are flushed of all blood. The steps taken to preserve the organs also include filling the abdominal cavity with an icy slush that keeps the organs cold.

¶7.    Dr. Wynn further explained that, after the heart, lungs, liver, and pancreas are removed, surgeons procure the two kidneys.  In the process of removing the kidneys, a surgical assistant lifts the kidneys up outside the body while they are still attached to the donor's body by blood vessels (including renal arteries) so that the surgeon can cut the kidneys free from the donor's body (i.e., free from the donor's aorta and vena cava), while being sure not to cut the blood vessels near where they enter the kidney.

¶8.    According to Dr. Wynn, a natural consequence of the kidneys being held outside the donor's body while the surgeon cuts the blood vessels free from the body is that there is some traction on the blood vessels, including the renal arteries.  The renal arteries, which transport blood into the kidney, are composed of three layers: the outer layer called the adventitia, the middle layer called the media, and the innermost layer called the intima.  Each layer has a different tolerance for being stretched.  The adventitia and media can withstand more stretching than the intima, and thus there is more risk of intimal tearing than tearing to the other layers at this point in the procedure.

¶9.    Dr. Barber testified that, at all times during the procurement procedure, the adventitia of the renal artery, including the area at the artery's midpoint, is obscured by fatty tissue.  In

4

addition, as Dr. Wynn testified, if the renal artery were damaged as the surgeon removes the kidney from the donor's body, there would be no possibility of adventitial hemorrhaging (i.e., blood staining visible from the outside of the renal artery) at the site of the damage, because all the blood would have been replaced by the clear preservation solution.

¶10.   According to Dr. Wynn and LifeSource's Director of Procurement, once the two kidneys are removed from the donor's body, they are carefully packaged in a hard plastic jar containing more preservation solution and then placed in a box with ice.  Each kidney is then shipped to the hospital(s) where the recipients of the donated kidneys will undergo kidney-transplant surgery.

¶11.   Dr. Wynn and Dr. Barber testified that, at the hospital where the transplant is to be performed, in order to prevent any unnecessary warming of the kidney, the transplant surgeon prepares the recipient for the transplant procedure prior to removing the kidney from the packaging in which it was placed by the procurement surgeon.[1]  Dr. Wynn explained that readying the recipient involves anesthetizing the recipient, inflating the recipient's bladder, opening the abdominal cavity, exposing blood vessels down to the recipient's leg, and preparing the recipient's blood vessels to receive the kidney.  Only after these steps are taken to prepare the recipient for transplant is the kidney removed from its packaging.  Thus,

---

[1] When asked whether "the standard of care for a transplant surgeon" calls for preparing a recipient for transplant prior to removing the kidney from its packaging, Dr. Barber testified that "[i]t is the way that the majority of transplant surgeons in the United States, and I believe worldwide, do this operation."  No medical expert disputed that, in modern medicine, it is customary and advised to prepare the recipient for transplant prior to removing the kidney from its packaging.

5

should the surgeon discover that there is a problem with the kidney (that makes the kidney unsuitable for transplant) at the time he unpacks it, unfortunately, the recipient already will have undergone a surgical procedure from which he must recover.

¶12. Dr. Wynn and Dr. Barber explained that, after unpacking the kidney, the transplant surgeon inspects it. The surgeon removes most of the fatty tissue from around the surface or capsule of the kidney so the capsule can be inspected. He also inspects the renal artery; however, the surgeon does not remove the fatty tissue around the renal artery because of the risk of damaging the blood supply to the ureter and to unrecognized accessory blood vessels to the kidney. The surgeon frees up only enough tissue from around the renal artery so that the artery is mobile enough to reach and attach to the recipient's artery without difficulty. Therefore, the transplant surgeon, looking at the length of the renal artery (including the midpoint), would not be able to see even the adventitia of the artery at the time of inspection of the kidney prior to transplant.

¶13. All expert witnesses who testified agreed that, in inspecting the kidney, the surgeon should inspect the ostium (i.e., the opening) of the renal artery. The experts disagreed, however, as to whether an intimal tear at the midpoint of the artery would be visible to a surgeon who properly examines the artery in preparation for transplant. Gore's expert witness contended that the intimal tear would be visible by peering through the ostium into the lumen of the artery.[2] Dr. Barber and Dr. Wynn, on the other hand, contended that it

---

[2] Gore's expert, Dr. Rodrigo Galvez, never exactly stated that the intimal tear would be visible by peering through the ostium into the lumen of the artery, but we will give Gore and Dr.

6

would be impossible to view the intimal tear by peering through the ostium, because the tear was located at the midpoint of the artery, not at or adjacent to the ostium (where intimal tears usually occur).[3]

¶14.  In the instant case, the donor was a woman who died in Minnesota as a result of an automobile accident.  The donor's family agreed to a donation of a number of her organs, including the kidneys.  Two University of Minnesota doctors training to become transplant surgeons harvested the kidneys in the manner described above.  One kidney was then transported to UMC.

¶15.  At UMC, Dr. Barber and others participating in the  procedure (hereinafter collectively referred to simply as Dr. Barber[4]) prepared Gore for the transplant.  Dr. Barber made an incision on Gore's right side.  He then readied Gore's blood vessels to be connected to the renal artery and renal vein of the donor kidney, and clamped Gore's blood vessels to

---

Galvez the benefit of the doubt by assuming that this is what Dr. Galvez meant when he stated the following:

> If this is a renal artery, okay, and you're going to do the grafting and you examine the inside, you are able to see whether there was a tear or not, whether there was a problem with the naked eye.  You don't need a magnifying . . . .

[3] All of the experts agreed that, if the inspection of the artery reveals an intimal tear at or adjacent to the ostium, the surgeon usually can repair the tear by making a stitch or cutting away the damaged portion of the artery (and then proceed to successfully transplant the kidney).  The record does not establish in what circumstances, if any, an intimal tear at the midpoint of the renal artery would be repairable.

[4] Throughout this opinion, we will use Dr. Barber's name to refer to Dr. Barber and/or other UMC surgical staff who participated in the transplant procedure.  This is because the record is not always clear regarding exactly who – whether it be Dr. Barber, the resident working under him, or someone else – performed different tasks in the operating room during the transplant procedure.

prevent blood flow through them while the kidney was being connected. Dr. Barber then removed the kidney from its packaging. He inspected the kidney and removed excess fatty tissue from around the kidney and from around the ends of the blood vessels to the extent necessary to prepare the blood vessels to be attached to Gore's blood vessels. Dr. Barber testified that, as he customarily does, he inspected the renal artery, which included "look[ing] down" the artery. Dr. Wynn testified that, in preparing the kidney for transplant, Dr. Barber could not have helped but examine the ostium of the artery, because he had to prepare the ostium for grafting. Gore (although, significantly, not Gore's expert) alleged that Dr. Barber did not inspect the renal artery.

¶16. The renal artery of the kidney at issue was eight millimeters (about one-third of an inch) in outside diameter and 4.5 centimeters (about two inches) long. The intimal tear was at the midpoint of the approximately two-inch-long artery.[5] The tear itself (which was a longitudinal tear that moved down the wall of the artery) was one to two centimeters (about .4 to .8 inches).

¶17. Once the kidney was inspected and prepared for transplant, Dr. Barber attached the renal artery of the donor kidney to Gore's artery (as well as attaching the renal vein). Dr. Barber then removed the clamps from Gore's blood vessels to establish blood flow to the kidney.

---

[5] Dr. Barber estimated that the tear was approximately three centimeters (1.2 inches) from the ostium of the blood vessel.

¶18.    From that point forward, the transplant did not go as planned.  After the kidneys were flushed with preservation solution in Minnesota, the kidneys turned from their normal pink color to a tan color.  Thus, the kidney transported to UMC was tan at the time Dr. Barber received it.  Normally, once the clamps are removed from the recipient's blood vessels and blood flow to the kidney is established, the kidney turns pink, which may happen immediately or take ten to fifteen minutes.[6]  In the instant case, the kidney did not turn pink as it should have.  Dr. Barber felt the renal artery for a pulse and, finding one, knew there was blood flow into at least part of the renal artery.  After about fifteen minutes from the time the clamps were released, Dr. Barber began trying to identify and correct the problem that was preventing arterial blood flow to the kidney.

¶19.    After several unsuccessful attempts to find and fix the problem, forty-five minutes had passed, and Dr. Barber made the decision, based on his experience and professional judgement, that this particular kidney was not going to function properly.  Even if the problem interfering with the arterial blood flow was repaired (in or outside Gore's body), the kidney still would not be a good kidney for Gore, because the kidney had warmed too much while it was filled with the blood that had flowed in from the renal vein and while it had sat in Gore's abdominal cavity for forty-five minutes.[7]

---

[6] Usually, before a kidney turns pink, it initially turns purple because of venous blood that backflows into the kidney.  The kidney in the instant case did turn purple.

[7] The kidney, if left in Gore's body, may have kept Gore from having to receive dialysis treatments for a short while, but it never would have functioned properly, and Dr. Barber determined that Gore would be better off having this kidney removed and getting a new kidney at a later time that would function properly.

¶20. After determining that the kidney would not be a good kidney for Gore, Dr. Barber began to dissect – meaning to remove fatty tissue, not cut – along the renal artery to be able to see the adventitia. The dissection revealed to Dr. Barber what appeared to be (from the outside of the artery) an intimal dissection (i.e., a longitudinal tear that moves down the wall of the artery) at the midpoint of the artery.[8]

¶21. The kidney was removed by cutting the renal artery of the donor kidney, leaving a section of the donor's renal artery attached to Gore's artery and thus shortening the length of the donor artery. In summary, in contrast to the appearance of the kidney when it was first removed from the packaging, there was now blood present in the renal artery, fatty tissue had been cut away from the renal artery, the renal artery had been shortened (making the tear now closer to ostium), and there was now an indication (due to adventitial hemorrhaging) of an intimal tear.

¶22. Dr. Barber explained that, after removing the kidney, he took the kidney to UMC's pathology department "to see if [they] could actually determine what the problem was beyond what [he] suspected, which was the intimal tear, and where that tear was." In the

---

[8] In his trial testimony, Dr. Barber stated that the intimal dissection or tear appeared to be located beneath the bifurcation or branching of the main renal artery, which, to a listener, sounds like a location closer to the kidney than the midpoint of the artery. Because at other times Dr. Barber and UMC contended that the tear was at the midpoint, we will give Gore the benefit of the doubt that the tear was located at the midpoint and no closer to the bifurcation of the renal artery (i.e., no closer to the kidney itself). It should be noted that stating that the tear was beneath the bifurcation of the renal artery is not necessarily inconsistent with stating that it was at the midpoint because: 1) the midpoint is beneath the bifurcation, and 2) the tear may have started at the midpoint and extended to near the bifurcation. By elaborating and stating that the tear was about three centimeters (1.2 inches) from the ostium, Dr. Barber clarified that he believed the tear to be at or slightly past the midpoint of the artery (i.e., slightly closer to the bifurcation than to the ostium).

pathology department, the renal artery was cut open and photographs were taken of the intimal tear.[9]

¶23.    Gore's complaint (filed in 2002 and twice amended in 2004) listed numerous defendants; however, by the time this matter went to trial, the only remaining defendants were UMC and LifeSource, a nonprofit organization that coordinates the process of organ and tissue donations, bridging the gap between the donation, procurement, and transplant processes.  As a nongovernmental defendant, LifeSource was entitled to a jury trial.

¶24.    Before trial, UMC filed a motion to submit the question of its liability to the jury for an advisory verdict.  Gore agreed to this, and the trial court granted the motion.  UMC, therefore, participated in the *voir dire* of the jury, submitted jury instructions, and argued the case to the jury.  The jury was not informed that its verdict was advisory as to UMC.  On April 13, 2007, after the week-long trial, the jury returned a verdict (voting nine to three) in favor of both LifeSource and UMC.

¶25.    The trial court chose not to follow the advisory jury verdict, and in March 2008, nearly a year after the trial, issued a judgment in favor of Gore against UMC, awarding Gore $326,678.13 in damages.  The trial court based its liability finding against UMC on the following findings of fact:

---

[9] The record is unclear as to whether the renal artery was already cut open when the UMC pathologist who examined it first saw it.  It *is* clear, however, that at some point while the kidney was in the pathology department, the tear was visible to the naked eye, and UMC does not dispute this.

11

If Dr. Barber had inspected the renal artery, he would have noticed the intimal tear because it was visible to the naked eye according to Dr. Allen [the UMC pathologist] and Dr. Galvez [Gore's medical expert]. Therefore, . . . Dr. Barber did not inspect the kidney prior to the transplant thereby breaching the standard of care.

## DISCUSSION

**Are the trial court's findings of fact supporting its liability finding against UMC against the overwhelming weight of the evidence?**

¶26.    UMC argues that the trial court's findings of fact supporting the liability finding against UMC are against the overwhelming weight of the evidence.

¶27.    This Court has clearly established that, in order to make out a prima facie case of medical negligence, a plaintiff must prove that:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and (4) the plaintiff was injured as a result.

*Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 650 (Miss. 2009).  "The general rule in Mississippi is that medical negligence may be established only by expert medical testimony, with an exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience." *Id.* (internal quotations omitted). *See also* *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992) ("Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries.").

¶28.    This Court will not disturb a trial court's findings if they are supported by substantial evidence.[10]  ***Miss. Dep't of Envtl. Quality v. Weems***, 653 So. 2d 266, 274 (Miss. 1995). Stated differently, this Court will not disturb a trial court's findings unless they are against the overwhelming weight of the evidence.  ***Id.***  This Court will not hesitate to reverse if the trial court's decision is manifestly wrong.[11]  ***Id.***  "A court's ruling is not based on substantial evidence if glaringly obvious evidence is ignored."  ***Univ. of Miss. Med. Ctr. v. Pounders***, 970 So. 2d 141, 147 (Miss. 2007).

¶29.    The trial court's findings of fact supporting its ruling against UMC were not supported by substantial evidence and were manifestly wrong.  The trial court's Order and Opinion found:

> The plaintiff established through expert testimony of Dr. Rodrigo Galvez that Dr. Barber should have inspected the kidney specifically the renal artery prior to the transplant.  If Dr. Barber had inspected the renal artery, he would have noticed the intimal tear because it was visible to the naked eye according to Dr. Allen and Dr. Galvez.
> Therefore, the Court finds that Dr. Barber did not inspect the kidney prior to transplant breaching the standard of care.[12]

---

[10] This Court has defined "substantial evidence" as "'such relevant evidence as reasonable minds might accept as adequate to support a conclusion' or to put it simply, more than a 'mere scintilla' of evidence."  ***Hooks v. George County***, 748 So. 2d 678, 680 (Miss 1999) (quoting ***Johnson v. Ferguson***, 435 So. 2d 1191, 1195 (Miss. 1983)).

[11] "The word 'manifest,' as defined in this context, means 'unmistakable, clear, plain, or indisputable.'"  ***Transocean Enter., Inc. v. Ingalls Shipbuilding, Inc.***, 2010 WL 817328, at *3 (Miss. Mar. 11, 2010).

[12] The trial court implicitly found that the tear existed at the time Dr. Barber examined the kidney prior to the transplant.
  The record does not definitively establish when the tear occurred.  Whether the tear occurred before or after Dr. Barber inspected the kidney is a disputed fact to the extent Gore contends that

¶30.    The remainder of this opinion will explain the following: The overwhelming weight of the evidence indicates that, when the kidney was examined by Dr. Barber in preparation for the transplant, the intimal tear (assuming it existed at that time) would not have been visible to the naked eye.  It is not clear that Dr. Allen's deposition testimony was intended to indicate, nor does indicate, that the tear was visible to the naked eye at the time Dr. Barber was examining the kidney prior to the transplant.  Thus, the only expert who testified that Dr. Barber would have been able to see the tear at the time he was examining the kidney prior to transplant (if the tear existed at that point) was Dr. Galvez, whose testimony revealed that he (Dr. Galvez) was uninformed about modern kidney procurement and transplant procedures.

¶31.    The overwhelming weight of the evidence indicates that, when the kidney was examined by Dr. Barber in preparation for the transplant, the intimal tear in the renal artery

---

the tear occurred during the transplant surgery itself.  We agree with UMC that the testimony of Dr. Galvez was confusing and that Gore's theory for liability on the part of UMC is less than clear. Gore's theory of liability, as expressed in his brief to this Court, is that "[t]he kidney was torn during surgery or not significantly inspected and as a result Joey Gore was severely injured."

Dr. Galvez concluded that the tear occurred, or most likely occurred, during the transplant surgery itself, but he offered no explanation as to how the tear would have come about during the transplant surgery.  Dr. Wynn, on the other hand, testified that it was most reasonable that the tear occurred during procurement when the surgical assistant was holding the kidneys outside the donor's body while the kidneys were still attached to the donor's body by blood vessels and there was consequently traction on the blood vessels, including the renal arteries.  Dr. Wynn further opined that it is highly unlikely that there was enough traction during the transplant procedure itself to cause the tear because Gore was a thin man at the time and thus the exposure of his blood vessels should not have been difficult – i.e., the grafting process would not have required that traction be placed on the kidney's blood vessels.  Dr. Wynn testified that "there was no indication that there were any unusual technical features or aspects of the operation that would have caused undue difficulty in fitting the kidney into where it needed to go and hooking the blood vessel together."

14

would not have been visible to the naked eye. As explained above, the renal artery is a tube, composed of three layers: an outer layer called the adventitia, a middle layer called the media, and the innermost layer called the intima. As also explained above, the renal artery of the kidney at issue was about one-third of an inch in outside diameter and about two inches long. The intimal tear was at the midpoint of the approximately two-inch-long artery. The tear itself was .4 to .8 inches in length.

¶32. As noted above, according to Dr. Wynn and Dr. Barber, a surgeon preparing a kidney for transplant into the body of a recipient does not remove or interfere with the fatty tissue surrounding the renal artery because of the risk of damaging the blood supply to the ureter and to unrecognized accessory arteries and veins to the kidney. The transplant surgeon removes only enough of the fatty tissue from around the artery as is necessary to allow the artery to reach and be attached to the recipient's artery without difficulty. Therefore, as Dr. Barber explained, the transplant surgeon cannot see even the adventitia at the midpoint of the artery.[13]

¶33. Moreover, Dr. Barber and Dr. Wynn, both very experienced kidney-transplant surgeons, testified that a surgeon would not be able to see the intimal tear located at the

---

[13] The fatty tissue surrounding the artery would also prevent a surgeon from being able to view adventitial hemorrhaging at the midpoint. However, recall that there would not have been adventitial hemorrhaging present at the time Dr. Barber was inspecting the kidney in preparation for the transplant because the kidney had been flushed of blood in Minnesota (even before the procurement doctors removed the kidney from the donor's body). The only time at which there possibly could have been adventitial hemorrhaging would have been before the kidney was flushed of blood (although it is unlikely the tear occurred any time prior to procurement) or after the kidney was transplanted into Gore's body and blood was reintroduced into the renal artery.

15

midpoint of the artery by peering through the ostium of the artery. As Dr. Barber testified, "[Y]ou're looking into an opaque tube that's about the size of a pencil there, and you cannot see far into the renal artery, and this area, [the area around the artery], is actually covered with fatty tissue that is normally not dissected away. So you can't see it from the outside." In later testimony, Dr. Barber explained that he could not see the tear "[b]ecause it was too far down in the renal artery to actually see by looking into the opening of the renal artery."

¶34.    In addition, Dr. Wynn testified that Dr. Barber could not have avoided inspecting the renal artery. Dr. Wynn explained that this is because, aside from it being very common practice for surgeons to inspect the artery, Dr. Barber described creating a carrel patch,[14] and in the process of doing that, a surgeon cannot avoid looking right at the opening of the renal artery – i.e., "if a tear occurred at a point where it could be seen, it would be seen." No expert testified that Dr. Barber failed to inspect the artery.

¶35.    Dr. Allen's deposition testimony,[15] read as a whole, does not clearly communicate that the tear was visible to the naked eye at the time Dr. Barber was examining the kidney prior to the transplant. First, Dr. Allen's deposition does not clearly indicate that, at the time the kidney was brought to the pathology department, the intimal tear itself (as opposed to an indication of the tear visible from looking at the adventitia of the artery) was visible to the

---

[14] Creating a carrel patch "involves holding the aorta, using pickups and scissors to stabilize it away from the opening to the renal artery, and using the scissor to cut away the excess aorta and to leave a cuff of aorta attached to the renal artery."

[15] Dr. Allen did not testify at the trial, but his deposition was taken and included in the record.

16

naked eye. Moreover, even if Dr. Allen's deposition were to be interpreted as clearly stating that the intimal tear itself was visible to the naked eye when Dr. Allen first saw the kidney, this would not indicate that the tear would have been visible to Dr. Barber at the time he inspected the kidney prior to transplant because: 1) the resident working under Dr. Allen may have cut open the artery before Dr. Allen looked at it for the first time; and/or 2) Dr. Allen may have been able to see the tear by peering through the ostium of the artery because part of the artery had been left in Gore's body and the artery was now shorter than it had been when Dr. Barber had examined the kidney before beginning the transplant procedure (i.e., the tear was now closer to the ostium).[16] [17] Therefore, the trial court was wrong to suggest

---

[16] While, at one point in his deposition, Dr. Allen said he could see the tear with his naked eye, at other times in his deposition, his answers suggested that what he meant when he said he could see the tear with his naked eye was that he could see evidence of the tear (e.g., adventitial hemorrhaging in the area of the tear) with his naked eye when he was called over by the resident working under him to look at the kidney for the first time. For example, he explained, "Well, you can tell that there's a break in the continuity of the vessel, but specifically what portion of the wall of the vessel requires histology . . . to be sure what you're looking at, you would have to have histology to be sure are we in the media, are we in the intima, or have we gone all the way through, things like that. . . ." He also stated, "When I got there, it was easily – it was easy enough for me to see grossly to agree that the artery had a disruption in it."

Alternatively, Dr. Allen's deposition testimony at one point suggested that the tear itself was visible, but only because the artery had been cut open by the time he, Dr. Allen, saw it for the first time. At another point, Dr. Allen stated that the artery was not cut open at the time it was brought to the pathology department. Dr. Allen did state the kidney looked "sort of like" the photographs shown on the first page of Exhibit 11 when he first saw it, and both Dr. Galvez and Dr. Wynn testified at photographs on the first page of Exhibit 11 show the artery cut open. Dr. Allen testified that he does not know whether the resident working under him dissected the artery in any way before he (Dr. Allen) first looked at it.

[17] Notably, Dr. Allen never stated that he peered into the ostium of the artery and, by doing so, was able to see the tear with the naked eye. In other words, even though the artery had been shortened by the time it arrived at the pathology department, there is no indication in Dr. Allen's deposition testimony that, even at that point, a surgeon would have been able to peer through the ostium of the artery and view the intimal tear with the naked eye.

17

that, by stating the tear was visible to the naked eye, Dr. Allen necessarily meant that the tear would have been visible to Dr. Barber at the time Dr. Barber inspected the kidney prior to grafting. UMC does not dispute that the tear was visible to the naked eye in the pathology department.

¶36. Thus, the only expert who testified that Dr. Barber would have been able to see the tear at the time he was examining the kidney prior to transplant (if the tear existed at that point) was Dr. Galvez,[18] a pathologist and psychiatrist, whose testimony revealed that he (Dr. Galvez) was uninformed about modern kidney procurement and transplant procedures. Dr. Galvez acknowledged that he does not perform any type of surgery in his practice, has never procured a kidney for transplant, has never performed a kidney transplant, and has not been trained in nephrology. Further, the trial transcript includes several specific examples of Dr. Galvez's lack of familiarity with modern kidney procurement and transplant procedures.[19]

---

[18] Gore called two medical experts to support his claims: Dr. Carl Blond and Dr. Galvez. Dr. Blond, a nephrologist, offered no criticism of Dr. Barber's surgical care; rather, his testimony was concentrated on Gore's claim against LifeSource.

[19] The examples of Dr. Galvez's lack of familiarity include the following: Dr. Galvez testified that he was certain that the tear did not happen at the time of the donor's car accident because, if it did, there would have been adventitial hemorrhaging that would have been visible to the procurement doctors. However, assuming the car accident caused a small, partial tear that became a more complete, larger tear at the time of procurement (as Dr. Barber suggested may have been the case), and the artery still allowed passage of the flushing solution into the kidney, any hemorrhaging caused by the accident would not have been visible to the procurement doctors because the artery would have been flushed of blood by the time the procurement doctors removed the kidney. Moreover, the entire time the kidney was in Minnesota, the artery was still surrounded by fatty tissue that would have obscured the outside of the artery.

Similarly, assuming the tear happened during the procurement of the kidney (after it had been flushed of blood), it would be incorrect to assert that there would have been adventitial hemorrhaging present at the time Dr. Barber inspected the kidney prior to transplant; this is because

¶37.   Dr. Galvez's testimony, while less than clear, states that, if the tear existed prior to transplant, then a surgeon examining the renal artery prior to transplant "from within" or "inside" (which we surmise means by peering into the ostium[20]) would have been able to see the intimal tear.  However, Dr. Galvez did not explain how this would have been possible, given that the tear was located at the midpoint of the artery, not at or adjacent to the ostium, where intimal tears usually occur.[21] [22]

---

there was no blood in the kidney from the time the procurement doctors began the actual removal of the kidneys until the time the kidney was attached to Gore's blood vessels.  In addition, the artery remained surrounded by fatty tissue up until the time that Dr. Barber realized that the kidney was not a suitable kidney and began to dissect away the fatty tissue to try to identify the problem.

Dr. Barber explained that Dr. Galvez's lack of familiarity with modern transplant procedures may stem from the fact that the single procurement procedure Dr. Galvez testified to having observed was performed about thirty years ago, when the flushing of the organs was not done prior to their removal.  Therefore, at that time in the past, if the procurement doctor had created an intimal tear while removing the kidney, there would have been adventitial hemorrhaging; however, in modern times, and for the past twenty-plus years, the organs are flushed while in the donor's body prior to removal, and thus an intimal tear created at the time of removal would not result in adventitial hemorrhaging.

Lastly, Dr. Galvez testified that, if the artery was damaged at some point prior to arriving at UMC, Dr. Barber should have detected the tear before "put[ting] [Gore] through the surgery." This evidences that Dr. Galvez was not aware that, as the testimony of Dr. Barber and Dr. Wynn revealed, in modern transplant procedures, the recipient's body is opened and prepared for transplant prior to unpacking the kidney.

[20] See footnote 2, supra.

[21] Dr. Galvez's primary testimony regarding whether the tear was "visible to the naked eye" was simply a statement that Dr. Allen's pathology report stated that the tear was visible to the naked eye – i.e., that, at some point when the kidney was in the possession of the UMC pathology department, the tear was visible without the aid of a microscope – a fact no one disputes.  At a later point in Dr. Galvez's testimony, he again discussed the tear being visible to the naked eye in the context of stating that the tear would have been visible to Dr. Barber at the time of inspection (had the tear existed at that time), but Dr. Galvez never elaborated as to how this would have been possible.

Some of Dr. Galvez's testimony could be read as asserting that the tear was visible at the time Dr. Barber examined the kidney prior to transplant because adventitial hemorrhaging is visible to the naked eye.  This would be an incorrect statement, because even Dr. Galvez agreed that the

19

¶38. In summary, the overwhelming weight of the evidence indicates that, assuming the tear existed prior to the kidney arriving at UMC, careful inspection of the renal artery by Dr. Barber prior to grafting did not, or would not have, alerted him that there was a tear, because the tear was not visible at that time. The tear was not visible because the tear was at the midpoint of the artery, not at or adjacent to the ostium where tears usually are, and Dr. Barber could not see that far into the artery by peering through the ostium. In addition, there would not have been any adventitial hemorrhaging at the time Dr. Barber examined the kidney, because all blood had been flushed out of the kidney back in Minnesota prior to the kidney being removed from the donor's body. Furthermore, had there been, by some stretch of the imagination, any adventitial hemorrhaging, Dr. Barber would not have been able to see it, because there was fatty tissue encasing the artery (and it is neither customary nor safe to remove the fatty tissue from around the artery (aside from at the area around the ostium)). Therefore, whether or not Dr. Barber breached the established standard of care requiring inspection of the renal artery is irrelevant because, even if a surgeon thoroughly inspected

---

kidney was flushed of all blood prior to arriving at UMC. Furthermore, it was established that, prior to transplant, the artery was surrounded by fatty tissue that prevented the examining surgeon from viewing the adventitia.

[22] In UMC's brief, it reminds us that:

The material question was the appearance of the kidney before grafting, at a time when a kidney transplant surgeon had prepared the end of the renal artery for grafting into the donee's body and at a time when the kidney transplant surgeon must be careful not to disturb any parts of the kidney more than necessary. On this point, the evidence showed no expertise on the part of Dr. Galvez[, who does not handle or examine "live" kidneys in his practice as a pathologist].

20

the renal artery prior to transplant, the tear would not have been visible to him/her. Thus, given that Gore did not establish any other standard of care, it is impossible for him to make out a prima facie case for medical negligence.

¶39. For those reasons, we conclude that the trial court's finding that the tear was visible to the naked eye at the time Dr. Barber inspected it prior to transplant is not supported by substantial evidence. Accordingly, we find that the trial court's finding that Dr. Barber was negligent, and that UMC is liable, is not supported by substantial evidence and is manifestly wrong.

## CONCLUSION

¶40. We find that the trial court's findings of fact supporting its liability finding against UMC are against the overwhelming weight of the evidence. Finding this issue dispositive, we reverse and render the trial court's judgment against UMC.

¶41. **REVERSED AND RENDERED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**